## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| MEDICAL MUTUAL INSURANCE COMPANY OF MAINE, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Docket no. 2:16-cv-462-GZS |
| DOUGLAS BURKA, | ) ) ) | |
| Defendant. | ) ) | |

## ORDER ON DEFENDANT'S MOTION FOR AMENDMENT AND/OR CLARIFICATION AND PLAINTIFF'S MOTION TO REOPEN DISCOVERY

Before the Court is Defendant's Motion for Amendment and/or Clarification of the Court's May 3, 2017 Order (ECF No. 45) and Plaintiff's Motion to Reopen Discovery (ECF No. 48). For the reasons briefly explained below, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion. As a result of its decision to GRANT summary judgment in Plaintiff's favor on the issue of whether Plaintiff ever had a duty to defend the relevant suit in Maine state court, the Court DENIES AS MOOT Plaintiff's Motion.

## I.      PROCEDURAL HISTORY & REQUEST TO SUPPLEMENT THE RECORD

In its May 3, 2017 Order, the Court determined that further discovery was not necessary to determine Plaintiff's duty to defend in two civil actions brought against Defendant; that Plaintiff had no duty to defend in the Maryland action; and that Plaintiff had no duty to defend in the Maine action after the dismissal of any claim seeking damages because the relevant liability policy does not cover claims seeking other forms of relief. (ECF No. 44, Page ID # 522.) However, the Court concluded that it could not determine whether Plaintiff had a duty to defend in the Maine action

*before* the dismissal of the damages claims.  (ECF No. 44, Page ID # 521 n.10.)  Defendant has now moved to supplement the record to include additional documents from the Maine state court action and asks the Court to amend its prior ruling to address this issue and explicitly grant Defendant summary judgment on the question of whether Plaintiff had a duty to defend the Maine action through December 14, 2016.

Regarding Defendant's request to supplement the record before this Court, Defendant attached to his Motion six exhibits (ECF Nos. 48-1–48-6).  With respect to the exhibits that are pleadings or orders from the underlying Maine state court action, this request to supplement is GRANTED WITHOUT OBJECTION to the extent the exhibits have not already been placed on the docket and considered by the Court in connection with its May 3, 2017 Order.  With respect to the April 18, 2016 Opposition to Plaintiff's Motion to Amend in the Maine state court action (ECF No. 45-2), Plaintiff objects to the Court's consideration of that exhibit and argues that the exhibit is essentially immaterial to the question that Defendant now asks the Court to resolve.  The Court agrees and does not consider this motion paper in resolving the substantive question posed by the pending Motion for Amendment and/or Clarification.[1]

## II.    FACTUAL BACKGROUND

The Court directs interested readers to the factual background laid out in its May 3, 2017 Order (ECF No. 44) and limits its factual recitation here to the additional facts culled from the supplemented record as well as the key insurance policy provisions that inform the Court's analysis of the remaining duty to defend question.

---

[1] The Court likewise finds the June 7, 2017 Notice of Appeal (ECF No. 50-1) to be immaterial to the issues before the Court.  However, the Court notes that it is certainly able to take judicial notice of the fact that an appeal has been filed in the underlying Maine action.

*The Maine Action: Allison Burka v. Douglas Burka, Docket No. 16-CV-20 (Maine Superior Court, Cumberland County)*

As now clarified by the supplemented record, on December 30, 2015, Allison Burka, Defendant Douglas Burka's then-wife, filed a four-count complaint against him asserting Invasion of Privacy (Count I); Unlawful Disclosure of Confidential Health Care Information (Count II); Intentional Infliction of Emotional Distress (Count III); and violation of the California Comprehensive Computer Data Access and Fraud Act (Count IV). (ECF No. 45-1.) By Order dated March 29, 2016, the Maine Superior Court dismissed the Invasion of Privacy claim for failure to state a claim and dismissed the California state law claim without objection. (ECF No. 45-3.) Allison filed an Amended Complaint dated May 9, 2016, which did not include the California statutory claim but, despite the March 29th Order, did include the Invasion of Privacy claim. (ECF No. 45-4.) The Invasion of Privacy claim was again dismissed by the Superior Court on September 22, 2016. (ECF No. 45-5.) On December 14, 2016, the parties stipulated to the dismissal of the Intentional Infliction of Emotional Distress claim with prejudice, leaving only the unlawful disclosure claim. (ECF No. 45-6.)

The initially filed Complaint alleges that Douglas had engaged in, among other things, "unauthorized access to [Allison's] medical records." (Compl. (ECF No. 45-1) ¶ 1.) Specifically, the Complaint alleges,

> In April and May of 2015, without [Allison]'s permission, [Douglas] . . . improperly disclosed to himself and accessed or attempted to access [Allison]'s confidential health care information maintained by healthcare facilities and providers in Maine including but not limited to Maine Medical Center, Southern Maine Medical Center, and other healthcare facilities and practitioners associated with or controlled by MaineHealth, a Maine nonprofit corporation.

(Compl. ¶ 8.) In Count I, Allison alleges that Douglas had invaded her privacy by intruding upon her "confidential health care information" (Compl. ¶ 10) and that he had done so "with malice, in

3

that he was motivated by ill will toward" her (Compl. ¶ 11). The First Amended Complaint

elaborates on the allegations, stating,

> This is an action for damages and injunctive relief arising from a course of
> conduct by Defendant Douglas Burka that involved emotionally abusive and
> controlling conduct of the Defendant directed at Plaintiff Allison Burka [and]
> involved his unauthorized access to the medical records in Maine of Plaintiff . . .

(Amend. Compl. (ECF No. 45-4) ¶ 1.) The Complaint alleges that Douglas "had staff privileges

at Southern Maine Healthcare" (Amend. Compl. ¶ 12) and that during a period when "he was in

the Washington D.C. area but still employed in Maine and still a member of the medical staff at

Southern Maine Healthcare" (Amend. Compl. ¶ 15), Douglas "accessed [Allison]'s medical

records at Southern Maine Healthcare without her knowledge or consent" (Amend. Compl. ¶ 16).

The Complaint describes a previous incident in which Douglas had accessed Allison's medical

records without her consent when they were living in Nashville, Tennessee, and that "[a]s a result,

[she] soon stopped seeking services from mental health professionals at [the Nashville facility]

and was unwilling to seek such assistance elsewhere in Nashville because of her fear that [Douglas]

would access those records as well." (Amend. Compl. ¶ 10.) Further, the Complaint alleges that

when the couple moved to Maine, "[f]earful of [Douglas]'s ability and willingness to access her

confidential health records, [Allison] did not seek treatment for her worsening [mental] condition

which included suicidal ideation." (Amend. Compl. ¶ 12.) In general, Allison alleges that Douglas

accessed her medical records as part of "a continuing course of illegal conduct directed at [her]

physical and mental well-being" (Amend. Compl. ¶ 22) and was motivated by malice and ill will

in doing so (Amend. Compl. ¶ 25).

*The Professional Liability Policy*

Plaintiff Medical Mutual Insurance Company of Maine, Inc., issued a professional liability policy ("the Policy") for which the Named Insured is SMHC Physician Services, P.A.[2]  As previously determined by the Court, Douglas Burka was also an "insured" within the meaning of the Policy at the time of the relevant allegations in the Maine suit by virtue of his inclusion under the so-called Slot Policy Endorsement.  (ECF No. 44, Page ID # 516.)  The Endorsement provides the following coverage agreement:

> Coverage afforded to insured physicians under this Policy is limited to CLAIMS arising from MEDICAL INCIDENTS or from NON-PATIENT INCIDENTS which result from their PROFESSIONAL SERVICES rendered within the scope of their duties as a physician employee or contractor of the NAMED INSURED . . . .

(Policy (ECF No. 22-1), Page ID # 255.)  The general coverage agreement of the Policy provides,

> We agree to pay on your behalf DAMAGES and DEFENSE COSTS which you become legally obligated to pay due to any CLAIM made against you as a result of a MEDICAL INCIDENT as defined in this Policy . . . provided that:
>
> > 1.  the MEDICAL incident results from your PROFESSIONAL SERVICES . . . and the MEDICAL INCIDENT occurs on or after the Retroactive Date noted on the DECLARATIONS PAGE for this Policy;
>
> [and]
>
> We agree to pay on your behalf DAMAGES and DEFENSE COSTS which you become legally obligated to pay due to any CLAIM made against you as a result of a NON-PATIENT INCIDENT as defined in this Policy . . . provided that:
>
> > 1.  the NON-PATIENT INCIDENT results from your PROFESSIONAL SERVICES . . . and the NON-PATIENT INCIDENT occurs on or after the Retroactive Date noted on the DECLARATIONS PAGE for this Policy . . . .

---

[2] The Court understands that Southern Maine Health Care is the sole shareholder of SMHC Physician Services, P.A. ("SMHC") and has operated under the assumed name of Southern Maine Medical Center.  Southern Maine Health Care and SMHC are part of the MaineHealth network of healthcare providers.

(Policy, Page ID #s 271, 272.)  The Policy provides the relevant definitions as follows:

A. "CLAIM" means an oral or written demand against an INSURED for DAMAGES, and includes civil lawsuits . . . .

B. "DAMAGES" means monetary sums not exceeding the Limit of Liability for which you are legally obligated to pay (including pre-judgment interest) to compensate for injury or death as a result of a MEDICAL INCIDENT [or] a NON-PATIENT INCIDENT . . . DAMAGES do not include restitution, non-monetary relief or the cost of complying with non-monetary relief, uninsurable matters, fines, penalties, taxes or punitive, exemplary or multiplied damages (except when expressly required by law).

[. . .]

E. "INSURED" means any individual or organization listed as the NAMED INSURED or as an Additional INSURED on the DECLARATIONS PAGE or on an Endorsement to this Policy.  Other individuals or organization might also be INSUREDS if they qualify as such under the Policy's Section III. INSUREDS.

F. "MEDICAL INCIDENT" means any act, failure to act, or omission in the furnishing of PROFESSIONAL SERVICES to a PATIENT by any INSURED . . . .

[. . .]

H. "NON-PATIENT INCIDENT" means an occurrence other than a MEDICAL INCIDENT which arises from PROFESSIONAL SERVICES provided by an INSURED and which results in a CLAIM for DAMAGES . . . .

I. "PATIENT" means any person for whom any INSURED under this Policy directly performs PROFESSIONAL SERVICES in the form of healthcare treatment of that person . . . .

J. "PROFESSIONAL SERVICES" means an INSURED'S:

1. healthcare services to a PATIENT performed in the practice of physician or surgeon, including the furnishing of food or beverages, the furnishing or dispensing of medical supplies or appliances and the handling and postmortem examinations of human bodies;

2. services as a member of a hospital's or professional society's formal accreditation, peer review, credentialing, privileging, standards review or similar board or committee, including executing the directives of such board or committee;

6

3. obligation to maintain PATIENT confidentiality in the handling of PATIENT records in the direct course of providing PROFESSIONAL SERVICES to that PATIENT;

4. writing of books, papers, and articles relating to the technical aspects of medical practice if the same are published or distributed by a recognized technical or professional publisher, academic or professional journal, or professional or technical society or association.

PROFESSIONAL SERVICES do not include your billing and coding activities; therefore, there is no coverage for any CLAIM arising out of such activities. PROFESSIONAL SERVICES also do not include physical or electronic security measures to maintain the confidentiality of PATIENT records or any other records in the control of an INSURED; therefore, there is no coverage for CLAIMS based on actual, possible or alleged identity theft from your failure to adequately implement such security measures.

(Policy, Page ID #s 279-80.)


## III.   ANALYSIS

### a.  Defendant's Motion for Amendment and/or Clarification

Regardless of how Defendant has chosen to title his Motion, the Court treats the Motion as an additional motion for partial summary judgment on the issue of whether Plaintiff ever had a duty to defend the Maine suit. Although the general rule is that parties are entitled to only one "bite" at the summary judgment "apple," the Court concludes that in these unique circumstances it would be appropriate and in the best interests of justice to resolve Defendant's Motion on the merits.[3]

The Court therefore considers, on the supplemented record and as a matter of law, whether Plaintiff had a duty to defend in the Maine case before the dismissal of any claim seeking damages.

---

[3] In considering Defendant's Motion, the Court applies the same legal standard for summary judgment motions articulated in its May 3rd Order. (See ECF No. 44, Page ID #s 509-11.) To the extent Defendant contends that the Court erred in its treatment of the Maryland suit, the Court disagrees and sees no reason to revisit its ruling on that issue.

See City of South Portland et al. v. Me. Mun. Ass'n Prop. & Cas. Pool, 158 A.3d 11, 13 (Me. 2017) ("Whether an insurer owes a duty to defend is a question of law . . . .") (footnote omitted).

The procedure for determining whether a duty to defend exists, and the supporting rationale, is well established:

> To determine whether an insurer has a duty to defend, a court considers and compares two documents: the insurance policy and the underlying complaint against the insured. An insurer has a duty to defend an insured when the complaint, read broadly in conjunction with the policy, reveals the existence of any legal or factual basis that could *potentially be developed at trial and result in an award of damages covered by the terms of the policy* . . . . [The Law Court has] explained the comparison test and its low threshold for triggering an insurer's duty to defend as a test and a threshold designed to discourage mini-trials on the issue of the duty to defend.

Harlor v. Amica Mut. Ins. Co., 150 A.3d 793, 797-98 (Me. 2016) (emphasis added) (footnote, citations, and quotation marks omitted). A court must "appl[y] a broad construction of the underlying complaint in favor of the insured and a strict construction of policy exclusions and ambiguities against the insurer." Barnie's Bar & Grill, Inc. v. U.S. Liab. Ins. Co., 152 A.3d 613, 615 (Me. 2016). However, "[t]he court must interpret unambiguous language in a contract according to its plain and commonly accepted meaning." Peerless Ins. Co. v. Brennon, 564 A.2d 383, 384 (Me. 1989) (quotation marks omitted). Furthermore, "[a] contract of insurance, like any other contract, is to be construed in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument." Id. at 385 (quotation marks omitted).

Finally, a court should not "conjure the duty to defend from speculation or supposition," Barnie's Bar & Grill, Inc., 152 A.3d at 615, or "speculate about causes of action that were not stated," York Golf and Tennis Club v. Tudor Ins. Co., 845 A.2d 1173, 1175 (Me. 2004). Similarly, "[t]he facts alleged in the complaint need not make out a claim that specifically and unequivocally falls within the coverage," Harlor, 150 A.3d at 797 (quotation marks omitted), but a court should

not "read allegations into the complaint" to find a legal or factual basis for coverage that does not otherwise exist, Barnie's Bar & Grill, Inc., 152 A.3d at 616.

Because the Court has already determined that Douglas Burka was an insured within the meaning of the Policy during the period at issue in the Maine action, the Court compares the Complaint in the Maine suit with the Policy to determine whether Allison's claims fall within the Policy's coverage.[4] After careful consideration, the Court concludes that Allison's claims do not fall within the Policy's coverage. Granting that there is some lack of clarity in the pleadings regarding what entity held her medical records, the Court agrees with Defendant that it is not unduly speculative that Allison was a "patient" within the meaning of the Policy because the Policy definition only requires that she was a patient of any covered doctor under the Policy, not Douglas Burka himself.[5] (See Policy, Page ID # 279.) However, the Court reads the Policy's clear language to require that any covered patient claim must directly arise from the provision of professional services to that patient. As outlined above, a covered "medical incident" is defined as "any act, failure to act, or omission in the furnishing of PROFESSIONAL SERVICES to a PATIENT." (Policy, Page ID # 279.) "Professional services" is itself defined in part to encompass the "obligation to maintain PATIENT confidentiality in the handling of PATIENT records in the direct course of providing PROFESSIONAL SERVICES to that PATIENT." (Policy, Page ID # 280.) Finally, the slot endorsement provides that covered incidents must "result from [physicians'] PROFESSIONAL SERVICES *rendered within the scope of their duties*." (Policy, Page ID # 255) (emphasis added).

---

[4] Although the Amended Complaint fleshes out Allison's claims to some extent, the Court concludes that there is no substantive distinction between the two complaints for purposes of determining the duty to defend issue.

[5] As a result, it is apparent that any covered claim in this action would not constitute a "non-patient incident." (See Policy (ECF No. 22-1), Page ID # 280) (defining the scope of "professional services" to include the insured's "obligation to maintain PATIENT confidentiality in the handling of PATIENT records").

The Court acknowledges Defendant's argument that the Policy's definition of "professional services" is circular in that it includes the term "professional services." However, any circularity in the definition only goes to emphasize the clear importance of "professional services" to defining the scope of Policy coverage. Simply put, there is no ambiguity that the provision of professional services is a central component of any covered claim. Further, any common understanding of "professional services" would not encompass a physician maliciously and surreptitiously accessing a patient's medical records for the sole purpose of harassing, threatening, or embarrassing that patient based on a spousal relationship. The Court cannot divine, without resorting to undue speculation, reading allegations in or out of the Complaint, or ignoring the intention of the parties as expressed in the Policy's clear language, how Allison's claims in the Maine suit arose "in the furnishing of" or "in the direct course of providing" her professional services.[6] Rather, the claims directly arise from the spousal relationship and, as alleged in the Maine action, involved efforts by Defendant to harass and embarrass his wife. Therefore, on the record as supplemented, the Court concludes that Plaintiff never had a duty to defend the Maine suit.[7]

---

[6] Defendant suggests in part that there is a duty to defend because he alleges that "he was asked by his then-wife to check on her records and having done as requested—just as he would have done for any other patient of Physician Services or SMHC—after their divorce, he has been sued for complying." (Def.'s Reply in Support of Def.'s Mot. for Amendment and/or Clarification (ECF No. 50), Page ID # 580.) Even accepting this assertion, a defendant's characterization of the allegations in a suit, or assertion of facts to the contrary, cannot control the duty to defend analysis. If it did, resolving a duty to defend question would no longer involve simply comparing a complaint with the relevant insurance policy, and defendants could create a duty to defend where it would not otherwise exist based on the comparison test.

[7] To be explicit, the Court concludes that there is no duty to defend even if the dismissed Invasion of Privacy claim is somehow revived.

b. Plaintiff's Motion to Reopen Discovery

Because the Court concludes that further discovery is unnecessary to resolving the duty to defend question, as just discussed, the Court DENIES AS MOOT Plaintiff's Motion to Reopen Discovery. To the extent that the Court's May 3, 2017 Order addressed this request, the Court considers that prior ruling to be the law of the case and the Court sees no reason on the supplemented record to reconsider its prior ruling. See Buntin v. City of Boston, 857 F.3d 69, 72 (1st Cir. 2017) ("The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (quotation marks omitted).[8]

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion (ECF No. 45), DENIES AS MOOT Plaintiff's Motion (ECF No. 48), and ORDERS that judgment be entered in Plaintiff's favor on the remaining issue before the Court.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 29th day of August, 2017.

---

[8] The Court substantively addressed the parties' arguments about the consideration of extrinsic evidence in its May 3rd Order and will not further address the issue here.